REYES V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-366-CR

RAUL ORTIZ REYES APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Raul Ortiz Reyes appeals his conviction and sentence for possession of 400 or more grams of cocaine with intent to deliver.  In five issues, appellant challenges the legal and factual sufficiency of the evidence to support his conviction, complains that the trial court erred by overruling his motion to suppress evidence and by receiving the jury’s verdict because the verdict was vague and uncertain, and argues that the trial court’s judgment should be reformed to reflect only one conviction and sentence rather than two.  We affirm the trial court’s judgment as reformed.

At 9:30 or 10:00 a.m. on April 17, 2003, the Tarrant County Sheriff’s Office received a tip concerning appellant from a desk clerk at the Comfort Suites hotel located at 6405 South Freeway in Fort Worth.  The desk clerk reported several suspicious factors arising from appellant’s check-in at the hotel earlier that morning.  For instance, appellant paid in cash, was evasive about how long he would need the hotel room, left the vehicle identification portion of his registration form blank, and upon the desk clerk’s request, gave the clerk an invalid license plate number for his vehicle. 

Deputies Kevin Turner and Chuck Wiesman from the Tarrant County Sheriff’s Department were dispatched to investigate the desk clerk’s tip.  In addition, Buster, a drug-sniffing dog assigned to Deputy Wiesman, accompanied them.  Buster alerted on appellant’s hotel room door.  An hour or so later, Buster alerted on the passenger side of the Chevy Tahoe in which appellant had been a passenger.  The deputies called for back-up assistance and were joined by Deputy Floyd Heckman and a Sergeant Dennis. 

The deputies then knocked on appellant’s hotel room door.  Alberto Garcia answered the door and consented to the deputies’ entry into the room.
(footnote: 2) The deputies believed, however, that consent to search had to come from appellant, since he had registered for the room.  When appellant claimed that he had a limited English vocabulary, the deputies asked Garcia to translate for appellant.  Garcia advised that appellant understood what the deputies were asking, but did not translate the consent to search form for appellant. The deputies then contacted the Fort Worth Police Department and requested a translator.
(footnote: 3) 

Julio Quepons, a citizen with Fort Worth’s Code Blue program, arrived to translate for appellant.   After Quepons explained to appellant what was being requested and that he did not have to consent to the search, appellant told Quepons it was fine to search the room.  Quepons, in turn, told the deputies that appellant had consented to a search of the room, and appellant signed a consent-to-search form. 

As a result of the search, the deputies found 5.1 kilos of cocaine, with a street value of $250,000, and $30,000 in cash hidden in appellant and Garcia’s room.  The money was found in a camouflage bag stuffed between the box springs and frame of one of two beds in the room.  The cocaine was discovered in a black and grey duffel bag that had been placed under the box springs of the second bed. 

Thereafter, appellant was indicted, tried, and convicted by a jury of possession of 400 or more grams of cocaine with intent to deliver.  This appeal followed. 

In his first and second issues, appellant contends the evidence is legally and factually insufficient to support his conviction because it does not sufficiently link him to the cocaine to establish the element of possession. To support a conviction for unlawful possession of a controlled substance, the State must affirmatively link the accused to the contraband by proving that the accused (1) exercised care, control, and management over the contraband and (2) knew the substance he possessed was contraband.
(footnote: 4)  
The defendant’s mere presence at the scene of the offense is not enough.  Rather, when the accused is not in exclusive possession of the place where the substance is found, the State has the burden of presenting evidence of independent facts and circumstances that give rise to a reasonable inference that the defendant knew of the contraband’s existence and its whereabouts.
(footnote: 5)   Affirmative links can be proven by direct or circumstantial evidence.
(footnote: 6) Possible affirmative links include the following:  (1) whether the defendant was present when the drugs were found;  (2) whether the drugs were in plain view;  (3) whether the drugs were found in proximity to and were accessible to the defendant;  (4) whether the defendant was under the influence of drugs;  (5) whether the defendant possessed other contraband or drug paraphernalia;  (6) whether the defendant made incriminating statements; (7) whether the defendant attempted to flee;  (8) whether the defendant made furtive gestures;  (9) whether there was an odor of drugs;  (10) whether the defendant owned or had the right to possess the place where the drugs were found;  (11) whether the place where the drugs were found was enclosed;  (12) the amount of drugs found;  (13) whether the defendant possessed weapons; and (14) whether the defendant possessed a large amount of cash.
(footnote: 7) 

In this case, appellant acknowledges that he had registered for the hotel room in which the cocaine was found, that he was sharing the room with Garcia, and that he was present at the time of the search during which the cocaine and cash were found.  Further, there is evidence of additional affirmative links, such as appellant’s possession of drug paraphernalia, his engagement in furtive conduct, and the large amounts of cash and drugs found in appellant’s room.

Possession of drug paraphernalia.
  First, there is evidence that appellant possessed paraphernalia associated with the cocaine.  For example, the sheriff’s deputies observed appellant and Garcia arrive at the hotel together in a red Chevy Tahoe that Garcia was driving.  One or both of them carried a white plastic grocery store-type bag into the hotel room.
(footnote: 8)  Then appellant returned to the Tahoe, retrieved a semi-clear yellow plastic bag with a rectangular box inside, and took it into the hotel room.
(footnote: 9) 

When the deputies searched appellant’s hotel room, they saw plastic wrappings and rubber bands in plain view, and the cocaine and cash they found were wrapped in plastic wrap.  In addition, they found a white plastic bag from a dollar store with a box of Glad plastic wrap and rubber bands inside.  Also inside the white plastic bag were a Family Dollar Store receipt, dated April 17, 2003, for the purchase of a duffel bag, and a High Trails Equipment brand merchandise tag for a duffel bag.  The duffel bag in which the cocaine was found was a High Trails Equipment brand duffel bag. 

In addition, the deputies found a Dollar General Store receipt dated April 17, 2003, on the bathroom counter and a semi-clear, yellow Dollar General Store plastic bag in the bathroom wastebasket.  The Dollar General Store receipt was for the plastic wrap, rubber bands, and several highly scented personal hygiene products.  Deputy Turner testified that individuals involved in the distribution of illegal narcotics commonly use plastic wrap to package the narcotics and currency—as was done in this case.  The currency is wrapped in attempt to mask any residual odor on it from close contact with the narcotics. Further, persons transporting drugs often use highly scented hygiene products as odor-masking agents. 

Furtive conduct.
  Next, there is evidence that appellant engaged in furtive conduct.  As we have already discussed, appellant paid cash for his hotel room, was evasive about how long he intended to stay, left the vehicle identification portion of his registration form blank, and then, upon the desk clerk’s request, gave the clerk an invalid license number.  In addition, Quepons testified that, when he arrived to translate the consent form, appellant and Garcia appeared nervous.  Moreover, appellant admitted that he hid the $30,000 cash under his bed mattress at Garcia’s request when the sheriff’s deputies knocked on the hotel room door.  Appellant testified that he did this because Garcia woke appellant from a nap, began screaming, threw appellant the bag with the money in it, and told appellant it was his (Garcia’s) money and to save it.  Appellant testified that he was afraid they were going to be robbed. 

Large amount of cash.
  Evidence of a large amount of cash, such as the $30,000 found under appellant’s mattress, is evidence from which a jury may infer that an individual is trafficking in, and therefore has possession of, contraband.
(footnote: 10) 

Amount and odor of drugs.
  Finally, 5.1 kilos, or about 11 pounds, of cocaine were found under Garcia’s bed in appellant’s room, in a duffel bag that had just been purchased that morning.  Further, Deputy Turner testified that the cocaine had a distinct smell.  Because appellant and Garcia had arrived at the hotel earlier that morning in the same vehicle, and because the cocaine was found in a duffel bag that had just been purchased that day, the jury reasonably could have inferred that appellant would have either seen or smelled the cocaine and thus been aware of its presence.

Despite this evidence, appellant contends that the affirmative links evidence is insufficient because the cocaine was not in plain view in the hotel room but was found in a duffel bag under Garcia’s bed, the cocaine was not easily accessible to appellant, appellant denied having any knowledge of it, Garcia merely handed appellant the camouflage bag that was later shown to contain the $30,000 cash, and appellant did not have any contraband in his possession at the time of his arrest, he was not under the influence of any drugs, and he did not make any incriminating statements.
(footnote: 11)  

The absence of some affirmative link factors is not, however, evidence of an appellant’s innocence to be weighed against other evidence tending to link him to the contraband.
(footnote: 12)  Instead, the issue is whether there is sufficient evidence linking the appellant to the contraband to support the reasonable inference that he was knowingly in possession of it.
(footnote: 13) 
 Based on the evidence we have discussed, we hold that there is sufficient affirmative links evidence in this case.

In summary, the jury reasonably could have inferred from the evidence that appellant knew of the cocaine’s existence and that he exercised care, control, or management over the cocaine by purchasing or helping to purchase plastic wrap, hygiene products, and a duffel bag to conceal the cocaine’s presence in the hotel room.  Although appellant testified that Garcia purchased the plastic wrap and other products while appellant was asleep in the Tahoe and that appellant had no knowledge of the cocaine—or the $30,000 in cash until Garcia asked him to hide it—the jury, as the trier of fact, was free to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences therefrom.
(footnote: 14) 
 Accordingly, applying the appropriate standards of review,
(footnote: 15) we hold that the evidence is legally and factually sufficient to link appellant to the contraband and establish the element of possession.
(footnote: 16) Accordingly, we overrule appellant’s first and second issues.

In his third issue, appellant complains that the trial court erred by overruling his motion to suppress evidence.  Appellant contends that his consent to search the hotel room was not voluntary because the deputies had no consent to enter the hotel room in the first place.  Appellant further contends that his consent to search was the product of an illegal arrest and was involuntary because he was detained in his hotel room for over an hour before he signed the consent form, during which time he was dressed only in his underwear, he was not allowed to use the bathroom, he was afraid, he was given no 
Miranda
 warnings and was not told that he had the right to refuse to consent to the search, and Quepons did not translate the consent to search form word for word, but paraphrased it instead.  We will address these arguments in turn.

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.
(footnote: 17) 
 At a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.
(footnote: 18)  
Accordingly, the judge may believe or disbelieve all or any part of a witness's testimony, even if that testimony is uncontroverted.
(footnote: 19)  This is so because it is the trial court that observes first hand the demeanor and appearance of a witness, as opposed to an appellate court that can only read an impersonal record.
(footnote: 20) 

Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor.
(footnote: 21) 
 However, we review de novo a trial court's rulings on mixed questions of law and fact if they do not turn on the credibility and demeanor of witnesses.
(footnote: 22)  If the trial court’s decision is correct on any theory of law applicable to the case, the decision will be sustained.
(footnote: 23) 

Consent to search is one of the well-established exceptions to the constitutional requirements of both a warrant and probable cause.
(footnote: 24)  For a consent to search to be valid, it must be voluntary and cannot be coerced, by either explicit or implicit means.
(footnote: 25)  Consent is not established by showing no more than acquiescence to a claim of lawful authority.
(footnote: 26)  But a person’s consent is not rendered involuntary merely because he is detained or under arrest.
(footnote: 27)
 Voluntariness is a question of fact to be determined from all the circumstances surrounding the statement of consent.
(footnote: 28)  Although the federal constitution only requires the State to prove the voluntariness of consent by a preponderance of the evidence, the Texas Constitution requires the State to show by clear and convincing evidence that the consent was freely given.
(footnote: 29)  If the record supports a finding by clear and convincing evidence that consent to search was free and voluntary, we will not disturb that finding.
(footnote: 30)
 Consent to enter room.
  Appellant’s argument that the deputies had no consent to enter the hotel room is incorrect.  The record shows that Garcia answered the door when the deputies knocked on it and identified themselves and that Garcia “invited [the deputies] into the room.”  Further, appellant acknowledged at trial that Garcia had authority to allow people to enter the room because he was staying there, too.
(footnote: 31) 

Lawfulness of detention.
  Next, appellant argues that he was “in essence arrested”
(footnote: 32) during the time before he signed the consent form because he was detained improperly in his hotel room and was not free to leave.  Appellant contends that his detention was illegal because the police had no warrant and no probable cause to detain him. 

A law enforcement official may in appropriate circumstances and in an appropriate manner temporarily detain a person for investigative purposes even though there is no probable cause for arrest.
(footnote: 33) 
 In determining whether such a seizure was reasonable, we consider (1) whether the officer’s action was justified at its inception and (2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place.
(footnote: 34) 
 Thus, to justify the particular intrusion, the officer must be able to point to specific and articulable facts that, when taken together with reasonable inferences from those facts, lead the officer to conclude that the person detained is, has been, or soon will be engaged in criminal activity.
(footnote: 35) 
 These facts must amount to more than a mere hunch or suspicion.
(footnote: 36) 

The Supreme Court has declined to adopt an outside time limitation for a permissible 
Terry
 stop,
(footnote: 37) but a continued detention can be justified only for the amount of time needed to reasonably investigate the subject of the initial detention.
(footnote: 38) 
 In assessing whether a detention is too long in duration, we consider whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.
(footnote: 39)  The question is not whether some alternative was available but whether the police acted unreasonably in failing to recognize or pursue it.
(footnote: 40) 
 Further, actions by the detained individual that interfered with efforts to quickly resolve the detention are a factor properly considered in the determination of whether the prolonged detention was proper.
(footnote: 41) 

In this case, the deputies’ initial entry into the hotel room was not a detention because Garcia invited them inside upon their request.  Further, when the deputies entered the room, they knew that appellant had paid cash for the room, had been evasive about how long he would need the hotel room, had left the vehicle identification portion of his registration form blank, and then had given the hotel clerk an invalid license plate number for the Chevy Tahoe in which he had arrived with Garcia. 

The deputies also knew that the Tahoe was registered to Garcia at a Pharr, Texas address.
(footnote: 42)  Deputy Turner testified that Pharr is a town on the Texas-Mexico border through which large quantities of narcotics from Mexico are often shipped for distribution in Texas and the rest of the United States. Moreover, the deputies knew that Buster, the drug-sniffing dog, had alerted for the presence of drugs on appellant’s hotel room door and on the passenger side of the Tahoe where appellant had been a passenger.  Finally, once he was inside the room, Deputy Turner noticed that the mattress on the bed closest to the door was raised about a foot off the box springs and that something appeared to be hidden underneath the bedspread. 

These specific, articulable facts, when taken together with the reasonable inferences therefrom, were sufficient to have enabled the deputies to conclude that appellant and Garcia were, had been, or soon would be engaged in some type of criminal drug activity.
(footnote: 43) 
 Accordingly, the trial court properly concluded that the first prong of the 
Terry
 test was satisfied, i.e., that the deputies were justified in initiating the temporary detention of appellant to see if he would consent to a search of his room.
(footnote: 44) 

Further, the trial court found that appellant spoke English and that the deputies’ detention of appellant for up to an hour before he signed the consent form was largely the result of appellant’s and Garcia’s actions.
(footnote: 45)  The record supports this finding.
(footnote: 46)
 For example, Deputy Turner testified that the deputies initially believed that appellant spoke English because he spoke it well enough to register for the hotel room with a desk clerk who did not speak Spanish.  Garcia, on the other hand, who admittedly spoke English, did not register for the room.  In addition, appellant was a college graduate, and his trial testimony revealed that he could understand the deputies’ conversations in English; he testified that “one officer told the other one to put me [in] the handcuffs.” 

After he entered the hotel room, Deputy Turner asked appellant, in English, if he would consent to a search of the room for narcotics.  Appellant responded that he had a limited English vocabulary, but Garcia said he (Garcia) was able to speak English as well as Spanish.  At Deputy Turner’s request, Garcia asked appellant, in Spanish, if appellant would consent to a search of the room.  Garcia told Deputy Turner that appellant understood what was being asked of him.  When Deputy Turner gave Garcia the consent to search form, however, and asked Garcia to translate it into Spanish, Garcia acted like he could not understand, and he did not translate the form.  

No Spanish-speaking sheriff’s deputies were on duty that day, so Deputy Turner contacted the Fort Worth Police Department and asked if a Spanish-speaking officer was present.  Between fifteen and thirty minutes after Deputy Turner made the initial request for a Spanish-speaking sheriff’s deputy or police officer, Quepons arrived.  Quepons testified that he left his home immediately upon receiving the request to translate and went to the hotel, but that the hotel was not in his neighborhood. 

Deputy Turner asked Quepons to (1) translate the consent to search form and (2) ask appellant if he would give his consent to search by signing the consent form.  After Quepons did the translating, appellant said, “Yes, that’s fine,” and signed the consent form.  Deputy Turner estimated that this took only a couple of minutes; Quepons estimated that it took ten to fifteen minutes. 

This evidence supports the trial court’s findings that the detention of appellant before he signed the consent form was due to his and Garcia’s conduct, as well as the court’s implied finding that Deputy Turner had diligently pursued a means of investigation that was likely to confirm or dispel quickly his suspicions regarding appellant’s illegal drug activity.
(footnote: 47) 
 Accordingly, the trial court properly concluded that the second prong of the 
Terry
 test was satisfied, i.e., that the detention was reasonably related in scope to the circumstances that justified the interference in the first place.
(footnote: 48) 
 Because the evidence shows that the primary purpose of the delay was the deputies’ attempt to get an informed answer from appellant regarding whether he would consent to a search of the room, the trial court properly concluded that appellant’s signing of the consent to search form was not the product of an illegal detention.

Voluntariness.
  Finally, we turn to appellant’s argument that his consent to search was involuntary because during his hour-long detention he was dressed only in his underwear, he was not allowed to use the restroom, he was threatened by the deputies and afraid, he was given no 
Miranda
 warnings and was not told that he had the right to refuse to consent to the search, and Quepons did not translate the consent to search form verbatim but paraphrased it instead.

At the motion to suppress hearing, appellant testified to all these things.  Appellant further testified that he finally decided to sign the consent form—even though he did not understand it—because he was afraid and needed to use the restroom.  According to appellant, as soon as he did so, the officers allowed him to use the toilet. 

Conversely, Deputy Turner testified that the atmosphere of the room was very calm.  Appellant and Garcia were both seated on the couch, Deputy Turner was in the room, Deputy Wiesman was near the door so that no one could slam the door and take Deputy Turner hostage, and two other officers (Deputy Heckman and Sergeant Dennis) stood outside the room near the door and did not enter the room until after appellant had signed the consent form.  Only Deputy Wiesman was in uniform.  The other three deputies were dressed in street clothes, although they wore sheriff’s vests and badges.  Appellant and Garcia were not handcuffed.
(footnote: 49)  Although the deputies each had weapons, they were not drawn, and the deputies did not threaten appellant or Garcia. Likewise, Quepons and Deputy Heckman testified that the deputies’ guns remained holstered.  Quepons further testified that, when he arrived to translate, appellant and Garcia seemed nervous, but the atmosphere was not tense and the deputies were not yelling or screaming. 

Deputy Heckman testified that he had no recollection of appellant’s asking to use the restroom.  Deputy Turner testified that neither appellant nor Garcia asked to use the bathroom, but they would have been allowed to do so if they had.
(footnote: 50) 

Deputies Turner, Heckman, and Wiesman testified that both appellant and Garcia were dressed when Turner entered the hotel room.  Deputy Heckman testified that appellant and Garcia were wearing shirts and either jeans or shorts.  Deputy Turner testified that appellant was wearing dark colored slacks and a black T-shirt, and a photo was admitted into evidence showing appellant in this clothing.
(footnote: 51)  Deputy Turner testified that he never saw appellant without his pants on. 

Regarding appellant’s signing of the consent form, Quepons testified that he went over the form and translated for appellant for ten to fifteen minutes. He testified that he did not translate the form verbatim but instead paraphrased it.  Also, there is no evidence that 
Miranda
 warnings were given.

There is no requirement, however, that a consent form be translated word for word,
(footnote: 52) and the failure to give 
Miranda
 warnings does not, by itself, render a consent involuntary.
(footnote: 53)  Here, Quepons testified that he informed appellant, and appellant seemed to understand, that the officers wanted to search the room but that appellant did not have to give his consent to the search.  Quepons denied telling appellant that it would be better for him to sign the consent form.  Instead, Quepons testified that, when he asked appellant in Spanish if he would consent to the search, appellant said, “Yes, that’s fine” and then signed the form.
(footnote: 54)  Deputy Turner also denied threatening to get a search warrant if appellant refused to sign the consent form.  In addition, appellant testified that Garcia told him not to sign the consent form because “they need another paper [i.e., a warrant] to do this.” 

Having carefully reviewed the record, we hold that the trial court properly determined that the State proved by clear and convincing evidence that appellant’s consent to search was voluntary and not coerced.
(footnote: 55)  Although there are conflicts between appellant’s and the deputies and Quepons’s versions of the facts, the trial court was free to believe or disbelieve all or any part of the witnesses’ testimony and to decide what weight to give it.
(footnote: 56)  Accordingly, we will not disturb the trial court’s finding of voluntariness.
(footnote: 57) 

Further, because the evidence shows that the deputies had consent to enter the hotel room, that appellant was not illegally detained, and that his consent to search was voluntary, the trial court properly denied appellant’s motion to suppress.  We overrule appellant’s third issue.

In his fourth issue, appellant complains that the trial court should not have received the jury’s guilty verdict because the verdict is vague and uncertain.  Although appellant concedes that “a verdict need not specifically name the offense except in cases where it would otherwise be uncertain,” he asserts that the verdict in this case “is uncertain” and “does not condemn a specific offense” because it fails to show the controlled substance that he allegedly possessed and its weight.  We disagree.

A verdict must be certain, consistent, and definite; it may not be conditional, qualified, speculative, inconclusive, or ambiguous.
(footnote: 58)  “A jury verdict will be held to be sufficient if its meaning can be reasonably ascertained from the words used.”
(footnote: 59)  Further, as appellant concedes, “The charge of the court may be looked to in aid of a verdict.”
(footnote: 60)  Thus, it is not error for the trial court to permit the jury to report its verdict on a form that does not use the precise wording of the charge as tracked in the indictment as long as it is clear to the court what the verdict is.
(footnote: 61) 

In this case, count one of the indictment alleges that, on or about April 17, 2003, appellant “intentionally or knowingly possess[ed] a controlled substance, namely cocaine of four hundred grams or more . . . with intent to deliver said controlled substance.”  Count two alleges that, on the same date, appellant “intentionally or knowingly possess[ed] a controlled substance, namely cocaine of four hundred grams or more.” 

The court’s charge instructed the jury:

Now, if you find from the evidence that on or about the 17th day of April, 2003, . . . the defendant . . . did then and there intentionally or knowingly possess a controlled substance, namely cocaine, of four hundred grams or more . . . with intent to deliver said controlled substance, then you will find the defendant guilty of the offense of possession with intent to deliver a controlled substance, as charged in count one of the indictment.

The charge contains a separate application paragraph for count two, which  tracks the language of count two of the indictment. 

The verdict form that the jury signed states, “We, the jury, find the defendant, Raul Ortiz Reyes, guilty of the offense of possession with intent to deliver a controlled substance.”  The jury left unsigned a separate guilty verdict form that refers only to possession of a controlled substance.  The signed guilty verdict, when read in conjunction with the court’s charge, clearly shows that the jury found appellant guilty of the offense alleged in count one of the indictment and tracked in the application paragraph of the court’s charge—possession of 400 or more grams of cocaine with intent to deliver.  Accordingly, the jury’s verdict “can be reasonably ascertained from the words used,”
(footnote: 62) and the trial court did not err by accepting it.  We overrule appellant’s fourth issue.

In his fifth issue, appellant contends that the trial court’s judgment improperly conflicts with the jury’s verdict because it recites that appellant was convicted of two offenses rather than one.  Appellant asserts that the judgment should be reformed to show that he was convicted of only one offense. The trial court’s judgment recites that appellant was convicted of both possession of 400 or more grams of cocaine with intent to deliver and possession of 400 or more grams of cocaine and that both offenses occurred on April 17, 2003.  The State concedes that the judgment incorrectly lists convictions and punishments for both counts in the indictment even though appellant was convicted only of count one and the trial court orally pronounced a sentence of twenty years’ imprisonment and a $10,000 fine for only that count.  Therefore, we sustain appellant’s fifth issue.

Having overruled appellant’s first through fourth issues and sustained his fifth issue, we reform the trial court’s judgment to delete the conviction and punishment for the possession offense alleged in count two of the indictment.  We affirm the trial court’s judgment as reformed.
(footnote: 63)

PER CURIAM

PANEL F: CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: January 5, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Only Deputy Turner entered the room.  Deputy Wiesman stood in the doorway, and the other two officers remained outside.  

3:
No Spanish-speaking sheriff’s deputies were available at the time. 

4:
Brown v. State,
 911 S.W.2d 744, 747 (Tex. Crim. App. 1995); 
Menchaca v. State,
 901 S.W.2d 640, 651 (Tex. App.—El Paso 1995, pet. ref’d).  

5:
Hernandez v. State,
 538 S.W.2d 127, 130 (Tex. Crim. App. 1976); 
Menchaca,
 901 S.W.2d at 651.

6:
Brown,
 911 S.W.2d at 747. 

7:
Hernandez,
 538 S.W.2d at 131; 
Taylor v. State,
 106 S.W.3d 827, 830-31 (Tex. App.—Dallas 2003, no pet.); 
Pettigrew v. State,
 908 S.W.2d 563, 571 (Tex. App.—Fort Worth 1995, pet. ref’d).

8:
There is some confusion about this evidence.  Deputy Turner testified initially that he saw appellant get out of the Tahoe that Garcia was driving and carry a white plastic grocery store bag into the hotel room.  Later, however, Deputy Turner testified that Garcia carried in the white plastic bag. 

9:
Appellant testified at trial and admitted that he had retrieved a bag from the Tahoe, but he claimed that he had done so at Garcia’s request.  Appellant testified that Garcia had purchased the items in the bag “possibly [from a] dollar store” while appellant was asleep in the Tahoe. 

10:
See Dade v. State, 
956 S.W.2d 75, 78-79 (Tex. App.—Tyler 1997, pet. ref’d).

11:
See 
Hernandez,
 538 S.W.2d at 131; 
Taylor,
 106 S.W.3d at 830-31; 
Pettigrew,
 908 S.W.2d at 571 (all listing most of these factors as evidence that can affirmatively link an accused to contraband).

12:
Hernandez,
 538 S.W.2d at 131. 

13:
Id.

14:
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
see also
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). 

15:
See
 
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005) (both setting out legal sufficiency standard of review); 
Zuniga v. State
, 144 S.W.3d 477, 481, 484-85 (Tex. Crim. App. 2004) (setting out factual sufficiency standard).

16:
See Brown,
 911 S.W.2d at 747; 
Menchaca,
 901 S.W.2d at 651.

17:
Carmouche v. State
, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000)
; 
Guzman v. State
, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). 

18:
State v. Ross
, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

19:
State v. Gray, 
158 S.W.3d 465, 466-67 (Tex. Crim. App. 2005); 
Ross, 
32 S.W.3d at 855.

20:
Ross, 
32 S.W.3d at 855.

21:
Johnson v. State
, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002).

22:
Id.

23:
Gray,
 158 S.W.3d at 466-67; 
Ross, 
32 S.W.3d at 855-56.

24:
Carmouche, 
10 S.W.3d at 331.

25:
Reasor v. State, 
12 S.W.3d 813, 818 (Tex. Crim. App. 2000); 
Carmouche, 
10 S.W.3d at 331. 

26:
Carmouche, 
10 S.W.3d at 331.

27:
Johnson, 
68 S.W.3d at 652-53;
 Reasor, 
12 S.W.3d at 818-19.

28:
Reasor,
 12 S.W.3d at 818; 
Carmouche, 
10 S.W.3d at 331. 

29:
Carmouche, 
10 S.W.3d at 331.

30:
Id
.

31:
See Illinois v. Rodriguez,
 497 U.S. 177, 181, 110 S. Ct. 2793, 2797 (1990) (holding that person who has common authority over premises may consent to warrantless entry of premises for purpose of an arrest or a search).

32:
Appellant concedes that his “formal arrest” occurred “after the contraband and other evidence were seized in the motel room.” 

33:
Terry v. Ohio,
 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968).

34:
Id.
 at 19-20, 88 S. Ct. at 1879.

35:
Terry,
 392 U.S. at 30, 88 S.Ct. at 1884-85; 
Brother v. State,
 166 S.W.3d 255, 257 (Tex. Crim. App. 2005). 

36:
Brother,
 166 S.W.3d at 257; 
Davis v. State,
 947 S.W.2d 240, 244 (Tex. Crim. App. 1997).

37:
United States v. Place,
 462 U.S. 696, 709-10 & n.10, 103 S. Ct. 2637, 2646 & n.10 (1983).

38:
Davis,
 947 S.W.2d at 243.

39:
United States v. Sharpe,
 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985). 

40:
Id.
 at 687, 105 S. Ct. at 1576. 

41:
Id.
 at 687-88, 105 S. Ct. at 1576.

42:
Deputy Turner testified that the deputies had, through trial and error, determined what the correct license number of the Tahoe was and had run a registration check on it. 

43:
See Terry,
 392 U.S. at 30, 88 S. Ct. at 1884-85; 
Brother,
 166 S.W.3d at 257.

44:
See Terry,
 392 U.S. at 19-20, 88 S. Ct. at 1879.

45:
The trial court made only three statements that can be construed as fact findings:

(1) They [the deputies] held them [appellant and Garcia] for an hour in their own room to get a consent to search. 

(2) I’m convinced that the defendant speaks English because I sat and listened to him on at least three or four occasions answer the question by the prosecutor before the interpretation was finished.  And I believe the testimony that he spoke English at the front desk [of the hotel] because why else would the person who doesn’t speak English go buy the motel room?  That doesn’t make any sense at all.  That doesn’t comport with human experience.

(3)  And so I find the delays in getting the consent to search were due to the defendant and his codefendant’s actions and shouldn’t be charged against the police . . . . 

46:
Although the finding was oral rather than written, a trial court may express its fact findings at a suppression hearing orally.  
See State v. Groves,
 837 S.W.2d 103, 105 n.5 (Tex. Crim. App. 1992).

47:
See Sharpe,
 470 U.S. at 686-88, 105 S. Ct. at 1575-76.

48:
See Terry,
 392 U.S. at 19-20, 88 S. Ct. at 1879.

49:
Appellant testified, inconsistently, that he was handcuffed before he signed the consent form and that he was not handcuffed until after he was arrested following the search. 

50:
The record does not support appellant’s contention that the trial court found that appellant was prevented from using the restroom.  Following an exchange with the prosecutor, the court simply concluded that appellant was 
detained
 because he would have had to ask to use the restroom, not that he was not allowed to use the restroom.

THE COURT: . . .  You yourself asked the question, did they ask you if they could use the restroom.  You know, when you have to ask to use the bathroom in your own room, you are not a free person.

. . . .

. . .  They held them in their own room, when they couldn’t even use the restroom in their own room for an hour for a consent to search.

[PROSECUTOR]:  If we believe the fact that he had to use the restroom.

THE COURT:  Okay.  Forget the using the restroom.  They held them for an hour in their own room to get a consent to search.

. . . .

. . .  Okay.  Here’s my question: Was it is full hour?  Do you agree with me it was an hour? 

51:
Appellant testified that the photograph was taken after he was arrested and told to put on pants. 

52:
See Gonzalez v. State,
 967 S.W.2d 457, 458-59 (Tex. App.—Fort Worth 1998, no pet.) (holding that verbatim Spanish translation of DWI consent form was not required).

53:
See Rayford v. State,
 125 S.W.3d 521, 528 (Tex. Crim. App. 2003) (holding that neither failure to inform accused that he can refuse to consent nor failure to give 
Miranda
 warnings automatically renders consent involuntary), 
cert. denied,
 125 S. Ct. 39 (2004).

54:
See Garcia v. State,
 No. 01-98-00626-CR, 1999 WL 796808, at *4 (Tex. App.—Houston [1st Dist.] Oct. 7, 1999, pet. ref’d) (not designated for publication) (holding that Spanish-speaking defendant’s consent to search was voluntary when he orally gave his consent after the matter was explained to him in Spanish and he understood that he was signing a consent to search form that would allow deputies to search his vehicle).

55:
See Reasor,
 12 S.W.3d at 818; 
Carmouche, 
10 S.W.3d at 331.

56:
Gray, 
158 S.W.3d at 466-67; 
Ross,
 32 S.W.3d at 855.

57:
See Carmouche,
 10 S.W.3d at 331.

58:
Clemons v. State, 
676 S.W.2d 356, 357 (Tex. Crim. App. 1984).

59:
Ortiz v. State, 
577 S.W.2d 246, 250 (Tex. Crim. App. 1979). 

60:
Caballero v. State
, 171 Tex. Crim. 133, 346 S.W.2d 343, 345 (1961). 

61:
Bradley v. State, 
655 S.W.2d 256, 258 (Tex. App.—Corpus Christi 1983, no pet.).

62:
Ortiz,
 577 S.W.2d at 250.

63:
See
 
Tex. R. App. P.
 43.2(b).